UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

BARTECH SYSTEMS INTERNATIONAL, INC.,

　　　　　　　　　　　　Plaintiff,

　　v.

MOBILE SIMPLE SOLUTIONS, INC.;
MOBILE SIMPLE SOLUTIONS (IAS), INC.;
VINCENT TESSIER; CHRISTELLE PIGEAT

　　　　　　　　　　　　Defendants.

Case No. 2:15-cv-02422-MMD-NJK

ORDER

(Pl.'s Motion for Preliminary Injunction)

I.　　SUMMARY

　　　Defendant Vincent Tessier is a former employee of Plaintiff Bartech Systems International, Inc. ("Bartech"), which provides hardware and software services for managing hotel minibars and other amenities. (ECF No. 1-32 at 5.) After leaving Bartech, Tessier partnered with Defendant Christelle Pigeat to create Mobile Simple Solutions, Inc. and Mobile Simple Solutions (IAS), Inc. (together, "Mobile Simple"), which also offer software solutions for minibar and amenities management. (*See id.* at 13.) Bartech claims, among other allegations, that Defendants misappropriated trade secrets and used copyrighted material in developing and marketing Mobile Simple's software. (*Id.* at 19-21, 28-29.) Bartech has filed a Motion for a Preliminary Injunction ("PI Motion") to foreclose Defendants from marketing and selling their software, or otherwise possessing or using Bartech's proprietary information. (ECF No. 16 at 5.)[1] After

_____
　　　[1]Bartech has filed three identical PI Motions due to sealing issues. (ECF Nos. 16, 67, 87.) This Order addresses all three.

1    reviewing the parties' response and reply briefs (ECF Nos. 42, 47) and holding a two-day
2    evidentiary hearing, the Court will grant the PI Motion in part.

3    **II.    BACKGROUND**

4          Bartech's core business is selling minibars and their accompanying software to
5    high-end hotels. (ECF No. 1-32 at 5; ECF No. 94 at 50.) Bartech's minibar models fall
6    into two broad categories: automatic minibars, which automatically sense when items
7    have been removed and charge customers accordingly; and manual minibars, which
8    must be stocked and maintained by hotel staff.[2] (ECF No. 1-32 at 6.)

9          Tessier began working for Bartech as a software and hardware developer in
10   1997. (ECF No. 16-2 at 4.) He was promoted to Bartech's Vice President of Research
11   and Development in 2005 (*id.*); he remained in that role until he resigned in May 2014.
12   (*See* ECF No. 42 at 31.) Throughout his years at Bartech, Tessier oversaw the
13   development of WebBart, a software system that allows Bartech customers to manage
14   their minibar operations electronically. (ECF No. 16-2 at 3-4; ECF No. 42 at 29.)
15   WebBart interfaces directly with hotels' property management systems ("PMS") to
16   ensure that any charges incurred for in-room amenities are posted to a guest's account.
17   (ECF No. 16-2 at 3.) The software also interacts with Bartech's automatic minibars. (*See*
18   *id.* at 3-4.) According to Bartech's employees, some hotels also use Bartech's software
19   to manage manual minibars. (*See* ECF No. 94 at 45-46.)

20         In 2010, Tessier met Pigeat at a hospitality conference; the two remained in
21   touch, and, in 2013, they began conceptualizing a new software business to serve hotels
22   using manual minibars. (ECF No. 42 at 29-30, 36-37.) Between 2013 and 2014, Pigeat
23   drafted a business plan and worked with a graphic designer to move forward with the
24   software business. (*Id.* at 36-37.) In February and March 2014, before resigning from
25   Bartech in May 2014, Tessier worked with a freelance web developer to begin

26

27         ───────────────────
           [2]Bartech also offers semi-automatic minibars, which monitor door openings and
28   refrigerator temperatures. (ECF No. 94 at 9.) These minibars do not have sensors that
     facilitate automatically charging a guest who removes an item.

1    implementing Pigeat's specifications. (*Id.*) Tessier and Pigeat launched Mobile Simple

2    Solutions — by way of its flagship ABreez software — at a hospitality trade show in June

3    2014. (*Id.* at 31, 38.) The software, however, required further development after the trade

4    show; Mobile Simple outsourced some portion of the remaining development, but

5    Tessier drafted the code that would allow ABreez to communicate directly with hotels'

6    PMS systems (the "PMS interface"). (*Id.* at 32, 38.) The PMS interface makes ABreez

7    more useful, but the software could still function without it. (*Id.* at 32.)

8         During this development period, between July and November 2014, Tessier

9    contacted several hotels in Las Vegas, seeking their feedback on ABreez, and offering a

10   free trial of the software. (ECF No. 95 at 129-30; *see* ECF Nos. 17-3 to 17-6.)

11   Meanwhile, in June 2014, Bartech announced BarTouch, a new web-based application

12   capable of managing non-Bartech minibars. (ECF No. 94 at 80-81.) Mobile Simple's

13   launch of the ABreez software helped prompt the BarTouch unveiling. (*Id.* at 81.) Mobile

14   Simple completed its first installation of the ABreez software in a Canadian hotel in May

15   2015. (ECF No. 42 at 38.) Since then, Mobile Simple and Bartech have both solicited

16   several of the same hotels as prospective customers of amenities software. (*See* ECF

17   No. 94 at 18-19, 269-70; ECF No. 16-20 at 2-3.)

18        Bartech initiated this lawsuit in Nevada state court on December 23, 2014,

19   claiming, in part, that Defendants had misappropriated Bartech's trade secrets and were

20   using them to compete unfairly. (ECF No. 1-1.) The case was removed on December 18,

21   2015, after Bartech discovered grounds for a federal copyright claim.[3] (*Id.*) Bartech filed

22   the PI Motion a month later, on January 14, 2016. (ECF No. 16.) After the PI Motion was

23   fully briefed, the Court held a two-day evidentiary hearing on the PI Motion on April 18

24   and 19, 2016. (*See* ECF Nos. 73, 74.)

25   ///

26   _____

27        [3]Because Bartech raises a claim of copyright infringement under the Copyright
     Act, 17 U.S.C. § 106, the Court has federal question jurisdiction over this action. 28
     U.S.C. § 1338. The Court may reach Bartech's related state-law claims by exercising its

28   supplemental jurisdiction. 28 U.S.C. § 1367.

## III.   LEGAL STANDARD

"'An injunction is a matter of equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 32 (2008)). To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of equities favors the plaintiff; and (4) that the injunction is in the public interest. *Winter*, 555 U.S. at 20.

Alternatively, in the Ninth Circuit, an injunction may issue under a "sliding scale" approach if there are serious questions going to the merits and the balance of equities tips sharply in the plaintiff's favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). The plaintiff, however, must still show a likelihood of irreparable harm and that an injunction is in the public interest. *Id.* at 1135. "[S]erious questions are those 'which cannot be resolved one way or the other at the hearing on the injunction.'" *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 926-27 (9th Cir. 2003) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)). They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Marcos*, 862 F.2d at 1362 (quoting *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

## IV.   ANALYSIS

Bartech seeks preliminary injunctive relief under three theories: copyright infringement, wrongful misappropriation of trade secrets, and unlawful computer access. (ECF No. 16 at 18-26.) Absent a preliminary injunction, Bartech insists that it will lose customers and consumer goodwill due to Defendants' infringing products and improper use of trade secrets. (*Id.* at 27-29.) Defendants counter that Bartech's business model is so different from Mobile Simple's that no direct competition exists between the two businesses. (ECF No. 42 at 5, 22-23.) Without direct competition, Defendants contend, Bartech cannot show that it would be irreparably harmed absent a preliminary injunction

1  — instead, any alleged harms could be remedied by damages and a forfeiture of

2  Defendants' intellectual property. (*Id.* at 22-23.) Defendants further argue that Bartech's

3  copyright, trade secrets, and unlawful computer access claims fall short on the merits.

4  (*Id.* at 16-22.) Both parties assert that the equities and the public interest tip in their

5  favor. The Court will address these arguments in turn.

6      **A.      Likelihood of Irreparable Harm**

7      There is no presumption of irreparable harm to a party seeking a preliminary

8  injunction in a copyright infringement action. *Flexible Lifeline Sys., Inc. v. Precision Lift,*

9  *Inc.*, 654 F.3d 989, 998 (9th Cir. 2011). Nor does such a presumption extend to

10  Bartech's trade secret and computer access claims. *See V'Guara Inc. v. Dec*, 925 F.

11  Supp. 2d 1120, 1126 (D. Nev. 2013) (citing *Flexible Lifeline Systems* in declining to

12  presume irreparable harm for a trade secret claim under Nevada law). Rather, the

13  moving party "must proffer evidence sufficient to establish a likelihood of irreparable

14  harm." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir.

15  2013). The Ninth Circuit has recognized that "[e]vidence of threatened loss of

16  prospective customers or goodwill certainly supports a finding of the possibility of

17  irreparable harm." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d

18  832, 841 (9th Cir. 2001). But "[e]vidence of loss of control over business reputation and

19  damage to goodwill" must demonstrate the likelihood — not simply a possibility — of

20  irreparable harm. *Herb Reed Enters.*, 736 F.3d at 1250. In short, the moving party must

21  offer "evidence that the claimed loss of customers or goodwill is real and imminent, not

22  just speculative or potential." *Giftango, LLC v. Rosenberg*, 925 F. Supp. 2d 1128, 1140

23  (D. Or. 2013).

24      Bartech asserts that it will lose customers and consumer goodwill without a

25  preliminary injunction. (ECF No. 16 at 27.) To date, however, Bartech has not lost any

26  existing customers to Mobile Simple. (ECF No. 94 at 76.) Rather, Bartech contends,

27  evidence that Mobile Simple is soliciting Bartech's existing customers and directly

28  competing against Bartech for prospective customers is sufficient to demonstrate a

1    likelihood of irreparable harm. (*See* ECF No. 16 at 27 (citing *Douglas Dynamics, LLC v.*
2    *Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in
3    competition against one another, the patentee suffers the harm — often irreparable — of
4    being forced to compete against products that incorporate and infringe its own patented
5    inventions.")).) Defendants dispute Bartech's characterization of their competition as
6    direct, claiming that Mobile Simple's ABreez software differs so drastically from Bartech's
7    suite of minibars that the two entities compete only indirectly — Mobile Simple targets
8    only hotels with manual minibars, whereas Bartech focuses on automatic minibars. (ECF
9    No. 42 at 22-23; ECF No. 95 at 24-25, 59.) Defendants concede, however, that Mobile
10   Simple and Bartech target similar prospective customers. (ECF No. 95 at 59-61.) But,
11   they contend, the possibility of indirect competition for prospective customers is too
12   speculative to establish a likelihood of irreparable harm. The Court disagrees. Bartech's
13   evidence demonstrates a likelihood of lost customers and consumer goodwill absent a
14   preliminary injunction.

15       First, the Court is unpersuaded by Defendants' attempts to construe Bartech's
16   business as singly focused on automatic minibars. While Bartech describes its "core
17   business" as the sale of automatic and semi-automatic minibars (ECF No. 94 at 50),
18   Bartech has presented evidence showing that it also sells manual minibars and
19   amenities-management software. Globally, nearly half of the hotels in Bartech's market
20   use manual minibars; a much smaller number (about 5%) of hotels in the company's
21   North American market have manual minibars. (*Id.*) But at least several of those North
22   American hotels use Bartech software to help manually manage minibars. Bartech's
23   president, Mario Agrario, identified one hotel — the W in Miami — that uses Bartech's
24   software as a stand-alone product. (*Id.* at 45-46.) Bartech's Accounting Training
25   Manager, Albert Huerta, testified that the following hotels use Bartech software
26   alongside the company's manual minibars: the Archer, the Intercontinental Willard, the
27   Bellagio, and the Aria. (*Id.* at 270-72.) Finally, as explained below, Bartech and Mobile
28   ///

1    Simple have attempted to sell software to several of the same prospective customers.

2    This evidence suggests that Bartech's customer base overlaps with Mobile Simple's.

3        Bartech's evidence further indicates that Mobile Simple is competing for Bartech's

4    existing customers. First, Bartech offers emails that Tessier sent to several Las Vegas

5    hotels — which are Bartech customers — between July and November 2014.[4] (ECF

6    Nos. 17-3 to 17-6.) In one email to the Aria, a known Bartech customer with both manual

7    and automatic minibars, Tessier states: "I think you will be interested to see how an

8    innovative solution can shake up two decades of minibar management. . . . Obviously I

9    know you already have a minibar solution but I would like to show you a demo of our

10   solution just to get your opinion." (ECF No. 17-4 at 3-4; ECF No. 94 at 267-68.) Tessier

11   wrote a nearly identical message to the Bellagio, which, like the Aria, uses Bartech's

12   automatic and manual minibars. (ECF No. 17-6; ECF No. 95 at 121-22.) Although

13   Defendants initially insisted that these emails were designed only to solicit feedback on

14   the ABreez product (ECF No. 95 at 210-11), Defendants admitted at the hearing that if

15   those hotels had offered to purchase ABreez during Tessier's demonstrations, they

16   would have made the sale. (*Id.* at 122-23.) Thus, even assuming that Tessier wanted

17   feedback from these hotels, his demonstrations also appear to have been marketing

18   pitches.

19       Defendants' attempt to characterize Tessier's demonstrations as solicitations for

20   feedback is further undermined by the fact that Tessier offered a free trial of ABreez

21   during his pitches. (*Id.* at 129.) Tessier testified, however, that the software was not fully

22   developed when he met with the Aria and other Las Vegas hotels. (*Id.* at 210-11.) At that

23   point, in the summer of 2014, all Tessier could offer was the ABreez mobile application

24   — the back end of the product, which would allow managers to consolidate inputs to the

25

26   [4]In addition to the Las Vegas hotels, Bartech asserts that Defendants approached
     a longtime Bartech customer in Paris with the ABreez solution. (ECF No. 47-6 at 3.) That
27   customer uses Bartech's automatic minibars, but, after being approached by Mobile
     Simple, asked Bartech whether it offered any software like ABreez. (*Id.*; ECF No. 94 at
28   19.)

1    mobile application, was still under development. (*Id.*) Nevertheless, despite the

2    software's ongoing development, at least one hotel — the Aria in Las Vegas — took the

3    offer. (*Id.* at 129-30.) Shortly thereafter, an Aria employee contacted Bartech with a

4    technical question regarding the ABreez software, seemingly confusing the Mobile

5    Simple product with Bartech's products. (ECF No. 94 at 267-69.) Similarly, a

6    representative of the Mirage suggested to Huerta that she was confused about the

7    ABreez product after attending Tessier's demonstration.[5] (*Id.* at 260-66.) These

8    reactions demonstrate that Bartech's customers expressed interest in, and were

9    confused by, Defendants' marketing of the ABreez product. Such confusion indicates a

10   likelihood of customer loss and reputational harm to Bartech.

11          Bartech's evidence likewise suggests — and neither party disputes — that

12   Defendants are competing against Bartech for prospective customers. A declaration by

13   the president of Bartech's French subsidiary, for example, identifies two luxury hotels in

14   Paris that Bartech and Mobile Simple solicited. (ECF No. 47-6 at 3.) Several witnesses

15   also testified during the hearing that Bartech and Mobile Simple competed to sell

16   software to the Trump Vancouver. (ECF No. 94 at 83-84; ECF No. 95 at 34-35.) The

17   hotel had purchased Bartech's manual minibars, but was entertaining a sales offer from

18   Mobile Simple in lieu of Bartech's software. (ECF No. 95 at 34-35.) Huerta described the

19   Trump as being dissatisfied with Bartech's software offerings after the hotel had seen a

20   demonstration of ABreez. (ECF No. 94 at 269-70.) As of the hearing, the Trump had not

21   yet decided on a software provider. (ECF No. 95 at 61.) Coupled with the testimony

22   regarding the parties' competition for the hotel, Huerta's testimony that the Trump had

23   expressed dissatisfaction with Bartech's software further illustrates that Defendants' use

24

_____

25          [5]This testimony involves an out of court statement offered for the truth of the
     matter asserted — that a Mirage employee told the witness that she was confused by
26   Tessier's outreach emails. Courts, however, may "consider hearsay in deciding whether
     to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir.
27   2009). The Court overruled a hearsay objection to this line of testimony during the
     hearing on these grounds, and the Court has given "some weight" to the evidence. *Id.*
28   (quoting *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

of ABreez in its current state poses a likelihood of lost customers and consumer goodwill to Bartech. The Court accordingly finds that Bartech has presented sufficient evidence to demonstrate a likelihood of irreparable harm absent an injunction in the form of lost customers, diminished consumer goodwill, and reputational harm.

### B.    Likelihood of Success on the Merits

Bartech premises its PI Motion on three claims: copyright infringement, trade secret misappropriation, and violations of the Nevada Computer Crimes Law ("NCCL"), NRS § 205.4765. (ECF No. 16 at 18-26.) At the close of the hearing, the Court issued an oral ruling on the NCCL claim, finding that Bartech failed to establish a likelihood of success on the merits of the claim. (ECF No. 95 at 298-99.) The Court explained that Bartech's evidence and arguments focused on Tessier's uses of Bartech's source code and emails, rather than his alleged unauthorized access to the company's computers, systems, or networks. (*Id.* at 299.) In light of the oral ruling, the Court need address only the misappropriation and copyright claims. Furthermore, because the Court finds a likelihood of success on the misappropriation claim, the Court will not reach the copyright claim.

Nevada's Uniform Trade Secrets Act ("UTSA"), which governs Bartech's misappropriation claim, provides that "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined." NRS § 600A.040(1). To demonstrate misappropriation under the UTSA, Bartech must show:

> (1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose.

*Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000) (per curiam). The UTSA further defines a trade secret as "information, including, without limitation, a . . . pattern, compilation . . . product, system, process, design . . . procedure, computer programming instruction or code" that "[d]erives independent economic value . . . from not being generally known to," or readily ascertainable to, the public. NRS § 600A.030(5). The

1   information must also be "the subject of efforts that are reasonable under the

2   circumstances to maintain its secrecy." NRS § 600A.030(5)(b). Misappropriation, in turn,

3   includes the "[d]isclosure or use of a trade secret of another without express or implied

4   consent by a person who" knew about the trade secret through improper means, or

5   through circumstances giving rise to a duty to maintain its secrecy. NRS

6   § 600A.030(2)(c).

7                    **1.      Trade Secrets**

8           Bartech contends that Defendants misappropriated the WebBart source code,

9   including the PMS interface; specifications for the PMS interface; and an internal and

10  confidential list of Bartech customers. (ECF No. 16 at 21.) According to Defendants,

11  however, Bartech has failed to establish that the source code, PMS specifications, and

12  customer list qualify as trade secrets, or that Tessier misappropriated them. (ECF No. 42

13  at 21-22.) Defendants additionally insist that Bartech never took the requisite steps to

14  protect those alleged trade secrets. (*Id.*) Defendants' arguments fall short.

15          The source code, PMS specifications, and customer list constitute information that

16  "[d]erives independent economic value . . . from not being generally known" or

17  ascertainable to the public. NRS § 600A.030(5)(a). Agrario testified that the source code

18  is not publicly available. (ECF No. 94 at 16.) Bartech keeps the source code confidential

19  to protect the investment that the company made in creating it. (*Id.* at 16-17.) Agrario

20  likewise testified that Bartech keeps its PMS specifications confidential to foreclose

21  competitors from profiting from them. (*Id.* at 29-30.) Similar to the source code,

22  competitors could save time and money that would otherwise be required to create the

23  specifications. (*Id.* at 30.) Bartech's customer list also contains confidential information

24  about all of Bartech's existing customers, including a subjective ranking system that

25  Bartech uses to record the quality of its relationship with each customer.[6] (*Id.* at 34-36.)

26  _____

27          [6]Defendants point out that the customer list at issue was last updated in 2011,
    three years before Tessier emailed the list to his personal email account. (*See* ECF No.
28  94 at 299.) Bartech's witnesses confirmed that the customer list has changed since
    2011, but also clarified that many contacts on the list continue to be Bartech's clients
    *(fn. cont...)*

1  Agrario testified that Bartech would be harmed if its customers knew how the company

2  had subjectively evaluated their relationships. (*Id.* at 36.)

3         Next, given the confidential nature of this information, Bartech also offered

4  testimony regarding the measures the company takes to protect its source code,

5  specifications, and customer list from public disclosure. *See* NRS § 600A.030(5)(b)

6  (trade secrets must be subject to reasonable efforts to maintain their secrecy). The

7  company's source code is kept within a password-protected, internal server, and only

8  Bartech's own developers have access to it. (ECF No. 94 at 16-17, 95.) The PMS

9  specifications are also kept on an internal server that requires a password. (*Id.* at 96.)

10  Bartech has shared its PMS specifications with its partners, including PMS companies,

11  in the course of its business. (*Id.* at 96-97.) But Bartech requires any third party to sign a

12  non-disclosure agreement ("NDA") before that party can gain access to Bartech's PMS

13  specifications.[7] (*Id.* at 30-31, 96-97.)  Finally, Bartech's customer list is shared internally

14  with employees, and is stored in a folder to which only select employees have access.

15  (*Id.* at 33, 287.)

16         Taken together, this evidence suggests that Bartech is likely to succeed in

17  establishing that the source code, PMS specifications, and customer list are trade

18  secrets under the UTSA.

19                    **2.    Misappropriation**

20         Bartech must also demonstrate that Defendants wrongfully misappropriated its

21  source code, PMS specifications, and customer list. NRS § 600A.030(2). The UTSA

22  ///

23  *(…fn. cont.)*

24  because they have long-term contracts with the company. (*Id.*) Absent evidence that the
list has become stale or unusable, the fact that the list was several years old at the time
of Tessier's resignation does not affect its status as a trade secret.

25         [7]There is some uncertainty over whether Bartech ever disclosed to Defendants an

26  NDA that Justin Freund (one of Bartech's employees) allegedly signed with a third party.
(ECF No. 94 at 174-75; ECF No. 95 at 319.) Two of Bartech's witnesses, however,

27  testified that the company's practice is to require NDAs before disclosing the PMS
specifications. Thus, despite this uncertainty, the evidence suggests that Bartech takes

28  reasonable steps to protect the PMS specifications.

identifies three permutations of misappropriation: (1) improperly acquiring another's trade secret; (2) acquiring a trade secret with knowledge, or reason to know, that the trade secret was improperly obtained; or (3) disclosing or using another's trade secret without consent, where the trade secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." NRS § 600A.030(2). Bartech focuses on the third, claiming that Tessier used or disclosed Bartech's non-public information — which he had acquired as a Bartech employee — to Pigeat and Mobile Simple. (ECF No. 16 at 24-25.) Bartech additionally emphasizes that the UTSA provides for injunctive relief to both actual and threatened misappropriation — even if Tessier has not used or disclosed the trade secrets at issue, his possession of Bartech's non-public information should warrant a preliminary injunction. (ECF No. 47 at 17-18.)

While analyzing a trade secret claim under an identical Idaho law, the Ninth Circuit held that trade secrets obtained by an employee through his work were acquired "under circumstances giving rise to a duty to maintain [the trade secret's] security or limit its use." *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1129 (9th Cir. 2010) (quoting Idaho Code Ann. § 48-801(2)(b)(B)(ii)). There, a former employee deleted source code that he had drafted from his employer's computers, threatened to withhold it, and disclosed a portion of the code to the Copyright Office. *Id.* at 1122-23, 1129-30. The court reasoned that the employee's disclosure to the Copyright Office "in itself, [was] not necessarily inconsistent with maintaining the secrecy and value of the trade secret," particularly in light of the Copyright Office's policy of keeping files under review confidential. *Id.* at 1129-30.

The court similarly found that the employee had not made "use" of the source code. *Id.* at 1131. "The term 'use' in the context of misappropriation of a trade secret," the court explained, "generally contemplates some type of use that reduces the value of the trade secret to the trade secret owner." *Id.* at 1130. Establishing improper use of a trade secret requires "demonstrat[ing] that the defendant received some sort of unfair trade advantage" from his or her use. *Id.* (quoting *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1325 (5th Cir. 1994)). Rather than using the source code, the employee had

merely possessed it and retained it in attempting to negotiate with his former employer. *Id.* at 1131. The court noted, however, that the employee's threatened use of the source code could be enjoined under Idaho law, which, like Nevada's UTSA, provides for injunctions of actual or threatened misappropriation. *Id.* (citing Idaho Code Ann. § 48-802). Although the employer could not establish damages for its misappropriation claim, it could seek injunctive relief against the employee's threatened use or disclosure. *Id.*

Here, Bartech has presented at least enough evidence to establish a basis for enjoining Defendants' threatened use of its trade secrets. First, in contrast to *JustMed, Inc.*, Bartech has offered evidence suggesting that Defendants have obtained an unfair competitive advantage from their use — or threatened use — of Bartech's source code, specifications, and customer list. As discussed above, Bartech has identified multiple examples of customers for which Bartech and Mobile Simple are either directly or indirectly competing. (*See supra* Section IV.A.) With regard to the source code and PMS specifications, Bartech claims that Mobile Simple's ability to compete is bolstered — if not facilitated — by its use of infringing source code for the PMS interface of the ABreez software. (*See* ECF Nos. 16-17, 57.) Indeed, Mobile Simple's marketing materials highlight the fact that ABreez can interface directly with PMS systems, a functionality that requires the source code at issue here. (*See* ECF No. 42 at 9 (depicting a figure entitled "How ABreez works," which describes one of the software's components as "interfac[ing] with third party vendors via Mobile Simple Interface Software").) And while Defendants deny using Bartech's customer list to market their product (ECF No. 395 at 75), it is undisputed that Tessier reached out to at least several contacts that appear on the list. (*See* ECF No. 94 at 60.) Thus, there is little question that Defendants could derive a competitive advantage over Bartech by using the source code, specifications, and customer list.

Nor is there any dispute over Tessier's access to these materials. Bartech has reproduced emails that Tessier sent to his personal email account in the months leading up to his resignation — one contains Bartech's 2011 customer list, while the other

1    includes Bartech's PMS interface specifications. (*See* ECF Nos. 16-18, 16-19.) Tessier

2    forwarded these emails from his Bartech account to his personal email address in

3    January and March 2014, respectively.[8] As for the PMS source code, Tessier admitted

4    to authoring the code used by both Bartech and Mobile Simple, indicating that he had

5    ready access to the code as a Bartech employee. (*See* ECF No. 95 at 240-47, 266.)

6    Bartech has shown that Tessier acquired the source code, specifications, and customer

7    list through his role as a Bartech employee, which is a "circumstance[] giving rise to a

8    duty to maintain [the trade secrets'] secrecy or limit [their] use." *JustMed, Inc.*, 600 F.3d

9    at 1129.

10          The parties' primary dispute is whether the source code that appears in the

11   ABreez PMS interface is similar enough to Bartech's code to establish that Tessier used

12   or disclosed the trade secret. Bartech's expert witness testified that, after examining the

13   ABreez source code alongside the Bartech source code, he concluded "[t]at the PMS

14   interface code in the Mobile Simple code base is substantially copied from the PMS

15   interface code in the Bartech code base." (ECF No. 94 at 184.) More important, although

16   Defendants' expert witness disagreed with the conclusion that Mobile Simple copied its

17   source code from Bartech, he nevertheless conceded that he saw "substantial

18   duplication" in the PMS interface codes. (ECF No. 95 at 274.) He ultimately testified that

19   there was "substantial similar[ity]" between the ABreez PMS source code and Bartech's

20   analogous code. (*Id.* at 283-84.) Finally, Tessier admitted during the hearing that he

21   memorized at least some of Bartech's source code and included it in the ABreez code.

22   (*Id.* at 246-47.)

23          In all, this evidence indicates that Defendants have gained an unfair advantage by

24   using Bartech's source code to develop substantially similar software for the ABreez

25   PMS interface. Bartech's evidence also demonstrates that Defendants could use the

26   ///

27   _____

28   [8]The Court finds Tessier's explanations for why he forwarded these emails a few
     months before his resignation to be unpersuasive.

1   customer list and the PMS specifications to gain a competitive advantage over Bartech.

2   Bartech is therefore likely to succeed on the merits of its misappropriation claim.

3   **C.    Balance of the Equities**

4   "To determine which way the balance of the hardships tips, a court must identify

5   the possible harm caused by the preliminary injunction against the possibility of the harm

6   caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096,

7   1108 (9th Cir. 1999). The court must then weigh "the hardships of each party against

8   one another." *Id.*

9   Defendants insist that a preliminary injunction would "put an unrecoverable

10   burden upon them" because their business could not function without the ability to sell

11   ABreez. (ECF No. 42 at 23; *see* ECF No. 95 at 62.) But Defendants also admit that

12   ABreez can function without the PMS interface. (ECF No. 42 at 12.) Indeed, Pigeat

13   testified during the hearing that as of April 2016, Mobile Simple had two customers who

14   had opted to use ABreez without a PMS interface. (ECF No. 95 at 64-65.) By contrast,

15   as discussed above, Bartech faces a likelihood of lost customers and consumer goodwill

16   if Defendants continue to create consumer confusion by marketing and selling ABreez in

17   its current state. Recognizing, however, that Defendants are in the initial stages of their

18   venture, the Court will narrowly tailor the injunctive relief to minimize harm to

19   Defendants.

20   **D.    Public Interest**

21   The Ninth Circuit has explained that "[w]hen the reach of an injunction is narrow,

22   limited only to the parties, and has no impact on non-parties, the public interest will be 'at

23   most a neutral factor in the analysis.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-

24   39 (9th Cir. 2009) (quoting *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 931 (9th Cir.

25   2003)). But if an injunction has "a potential for public consequences, the public interest

26   will be relevant to whether the district court grants the preliminary injunction." *Id.* at 1139.

27   Both parties assert that the public interest would be served by their respective

28   positions on the PI Motion. The preliminary injunction here, however, would be of limited

15

1    reach, requiring Defendants to stop any threatened or actual use of Bartech's trade

2    secrets. To the extent that the injunction would affect non-parties — Mobile Simple's

3    customers, for example — the Court finds that the public interest would be served by

4    injunction because consumer confusion would be minimized, and Bartech's intellectual

5    property preserved.

6           **E.    Scope of the Injunction**

7           Because Bartech has established a likelihood of success on the merits, a

8    likelihood of irreparable harm, that the balance of the equities tips in its favor, and that

9    the public interest would favor an injunction, the Court finds that a preliminary injunction

10   is appropriate. *Winter*, 555 U.S. at 20.

11          Bartech requests an injunction that would stop Defendants "from selling, leasing,

12   renting, or offering for sale, lease, rent, or subscription" any software or services that

13   contain Bartech's trade secrets. (ECF No. 16 at 5.) The injunction would also require

14   Defendants to notify their existing customers of the injunction, return any

15   misappropriated materials to Bartech, and avoid further infringement or misappropriation

16   of Bartech's intellectual property. (*Id.*)

17          The Court disagrees with the broad scope of Bartech's requested relief. Instead,

18   to ensure that Defendants are not unfairly harmed by the injunction, the Court will tailor

19   the preliminary injunction as follows:

20          (1) Except as provided for in this Order, Defendants must not sell, lease, rent, or

21              offer for sale, lease, rent or subscription, to any future customers, any

22              software applications or services that contain Bartech's source code or other

23              misappropriated trade secrets. Defendants may continue offering the ABreez

24              software to the approximately thirty customers who are using the software as

25              Pigeat testified. (ECF No. 95 at 62.) This provision does not cover any

26              current or future customers who utilize Defendants' "stand alone solution"

27   ///

28   ///

16

(i.e. customers who use ABreez software applications without the PMS interface).[9]

(2) Defendants must not possess, use, or disclose Bartech's trade secrets or other confidential or proprietary information, other than as described above.

(3) Within five (5) days, Defendants must return to Bartech the customer list, source code, PMS specifications, and any other confidential or proprietary information that Defendants obtained from Bartech. Defendants must file a status report with the Court that certifies the return of these materials.

(4) During the pendency of this action, Defendants must not misappropriate any of Bartech's trade secrets in violation of NRS § 600A *et seq.*, or infringe on any of Bartech's copyrighted works in violation of 17 U.S.C. § 101 *et seq.*

## V.   CONCLUSION

It is therefore ordered that Plaintiff's Motion for Preliminary Injunction (ECF Nos. 16, 67, 87) is granted in part. During the pendency of this action, Defendants must comply with the preliminary injunction described in Section IV.E of this Order.

It is further ordered that Defendants' Motion to File an Errata to their opposition to the Motion for Preliminary Injunction (ECF No. 41) is granted.

DATED THIS 24th day of May 2016

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

[9]Defendants represent that they currently have two customers in this category. (ECF No. 95 at 64.)

17